UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-2117(DSD/JMM)

Sunny Fresh Foods, Inc.,

Plaintiff,

v. **ORDER**

Michael Foods, Inc., and
North Carolina State University,

Defendants.

Felicia J. Boyd, Esq., Lori A. Wagner, Esq., Brian B. O'Neill, Esq., William L. Roberts, Esq. and Faegre & Benson, 2200 Wells Fargo Center, 90 South 7th Street, Minneapolis, MN 55402, and Steven C. Schroer, Esq. Philip T. Petti, Esq., Timothy P. Maloney, Esq. and Fitch, Even, Tabin & Flannery, 120 LaSalle Street South, Suite 1600, Chicago, IL 60603 counsel for plaintiff.

Justin H. Perl, Esq., Geoffrey P. Jarpe, Esq., Richard A. Kempf, Esq., and Maslon, Edelman, Borman & Brand, 3300 Wells Fargo Center, 90 South 7th Street, Minneapolis, MN 55402 and Richard P. Vitek, Esq., James D. Myers, Esq., D. Randall, Ayers, Esq. and Myers, Bigel, Sibley & Sajovec, P.O. Box 37428, Raleigh, NC 27627, counsel for defendants.

This matter is before the court upon defendants' motion to strike expert declarations and for claim construction of four patents-in-suit: U.S. Reissued Patent RE37,225E, U.S. Patent No. 4,808,425, U.S. Patent No. 4,957,759, U.S. Patent No. 4,994,291. Based on a review of the file, record and proceedings herein, and for the reasons stated, the court denies defendants' motion to

FILED 6-19-02
RICHARD D SLETTEN, CLERK
Judgment Ent'd. ______
Deputy Clerk's Initials ______

strike expert declarations and construes the patents-in-suit as follows:

1. "Liquid whole egg" refers to liquid whole egg or liquid whole egg blends containing less than 2% added non-egg ingredients. Such non-egg ingredients may include preservatives.

2. "Liquid whole egg product" refers to products which include liquid whole egg and may have more than 2% added non-egg ingredients. Such non-egg ingredients may include preservatives.

3 "Liquid whole egg blend" means blends of whole egg with less than 1% sugar and/or salt, liquid whole egg blends with 24 to 38% egg solids and 12% or less of added non-egg ingredients.

4. "Liquid whole egg product is liquid whole egg blend which is about 24.38% egg solids and about 12% or less of added non-egg ingredients," includes the term non-egg ingredients, which means any ingredients not naturally found in egg including shelf life extending additives.

5. "Where a liquid egg product contains not more than 12% of added non-egg ingredients" includes the term non-egg ingredients, which means any ingredients not naturally found in the egg including shelf life extending additives.

6. "Consisting essentially of liquid whole egg product" refers to products that include liquid whole egg product as set forth above but not elements that could materially affect the basic and novel characteristics of the liquid whole egg.

7. "Shelf life" means the period of time during which the product is not obviously spoiled using the organoleptic tests set forth in the patent under refrigerated (4 degrees Celsius) conditions.

8. "Extended refrigerated shelf life" means a shelf life longer than the 7 to 14 day shelf life of refrigerated liquid whole egg products which have been conventionally pasteurized.

9. "About" means approximately.

10. "Shelf life of from about 16 to 36 weeks under refrigerated conditions" means shelf life of approximately 16 to 36 weeks under refrigerated conditions.

11. "Shelf life of about 8 weeks to about 36 weeks" means shelf life of approximately 8 weeks to approximately 36 weeks.

12. "Shelf life of about 4 weeks to about 36 weeks" means shelf life of approximately 4 weeks to approximately 36 weeks.

13. "Shelf life of about 16 weeks" means shelf life of approximately 16 weeks.

14. "Shelf life of about 16 weeks to 36 weeks under refrigerated conditions" means shelf life of approximately 16 weeks to 36 weeks under refrigerated conditions.

15. "Characterized by refrigerated shelf life of about 4 to 36 weeks" means characterized by refrigerated shelf life of approximately 4 to 36 weeks.

16. "Equivalent point" requires the methods set out in the patent, including the 1982 and 1986 articles by Swartzel.

17. "Equivalent temperature" and "equivalent time" describe the total thermal treatment received by the liquid whole egg product during processing.

18. "Heated for a predetermined time and to a predetermined temperature insufficient to cause more than a 5% soluble protein loss (SPL) from said product" means testing a product to determine the difference in the soluble protein loss pre- and post-pasteurization based on the methods described in the patent.

19. "The total thermal treatment received by the liquid whole egg product [or "liquid whole egg"] is defined by [or "described by"] an equivalent temperature and an equivalent time defining a point about the 5% SPL (Batch) line of FIG. 3" means modeling the total thermal treatment received by the product according to the equivalent point calculation referred to in the patent specification and comparing the resultant equivalent point with the 5% SPL (Batch) line of Figure 3.

20. "Predetermined time/temperature" means established in advance based upon USDA preapproval requirements but not limited to commercial runs

21. "Preselected" means known ahead of time.

22. "A preselected refrigerated shelf life" means a refrigerated shelf life that is known ahead of time.

23. "Aseptically packaged," "aseptically packaging," and "aseptic packaging" mean packaged to the exclusion of microorganisms other than those carried by the liquid whole egg product.

24. "Packaging/packaged" means placed or placing in a container.

25. "Sterilize" means to make free of all viable microorganisms.

26. "Non-sterile pasteurized liquid whole egg" means liquid whole egg that has been pasteurized but not made free of all viable microorganisms.

27. "Contacting said liquid whole egg product to a heated surface" means the product is heated in contact with a higher temperature surface that does not need to be part of the heat exchanger.

28. "Turbulence" means the mixing of particles over the cross-section of the product stream. "Major portion of the time heated" means greater than 50% of the time the product is heated. "Periodically" means from time to time.

29. "Ultrapasteurizing" means to decrease the number of spoilage organisms below that obtained with conventional pasteurization without sacrificing functional performance.

30. "Coagulate" means to become a soft or semi-solid mass.

31. "Pasteurizing apparatus" means the equipment used to pasteurize the liquid egg product.

32. "Pasteurizing apparatus is sterilized" means that the equipment used to pasteurize the liquid egg product is made free of all viable microorganisms.

33. "Heating unit" means the heating section of the pasteurizing apparatus.

34. "Wherein every particle of liquid whole egg product is in contact with said heated surface for a total time less than the average resonance time of each particle in the heating unit" has its ordinary and accustomed meaning.

## BACKGROUND

Plaintiff Sunny Fresh Foods, Inc. ("Sunny Fresh") is the declaratory judgment plaintiff in this case. The patents-in-suit are owned by defendant North Carolina State University ("NCSU") and are exclusively licensed to defendant Michael Foods, Inc. (collectively "Michael Foods"). The parties bring the present proceeding pursuant to Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 387 (1996), requesting the court to determine the disputed claim elements of the four patents-in-suit, U.S. Reissued Patent RE37,225E ("the '225 Patent"), U.S. Patent No. 4,808,425 ("the '425 Patent"), U.S. Patent No. 4,957,759 ("the '759 Patent"), and U.S. Patent No. 4,994,291 ("the '291 Patent").

### A. The Patents-in-Suit

The patents-in-suit relate to a process by which liquid egg products can be "ultra-pasteurized" in order to extend their shelf life. The inventors developed a process by which liquid egg products could be "ultra-pasteurized" at temperatures higher than conventionally was thought possible without destroying the functionality of the egg. (See Stewart Decl. Ex. 2, '425 Patent, Col. 2, ll. 42-56.) The result was liquid egg products having a shelf life of four to thirty-six weeks. (See id., Col. 17, ll. 17-33.)

**B. Prior and Present Litigation**

By 1989, at least two other egg processors, Bartow Foods, Inc. ("Bartow") and Papetti's High Grade Egg Products ("Papetti's"), had introduced their own extended shelf life liquid egg products. Michael Foods sued Bartow and Papetti's for patent infringement. In March 1992, the jury in the Bartow case found that the '425 Patent was valid, enforceable and willfully infringed by Bartow. (Kempf Aff., Ex. 7.) Bartow then filed for bankruptcy. It did not appeal the jury verdict.

In the Papetti's case, the parties filed several summary judgment motions on liability issues. In a series of decisions, Judge Barry held that no reasonable juror could conclude that the NCSU patents were invalid, unenforceable or not infringed by Papetti's. (Kempf Aff., Ex. 8-9.) On appeal, the United States Court of Appeals for the Federal Circuit affirmed Judge Barry's findings. (Kempf Aff., Ex. 10.) The Papetti's case ultimately ended with a stipulated dismissal in 1997, after Michael Foods acquired Papetti's.

By 1994, Michael Foods was involved in two additional patent infringement lawsuits, one against Nulaid Foods, Inc. ("Nulaid") and the second against Sunny Fresh ("Sunny Fresh I"). During this time, competitors of Michael Foods filed several requests for reexamination of the NCSU patents with the patent office and several protests in a reissue proceeding involving one of the NCSU patents.

In December 1994, the Nulaid litigation was stayed pending the conclusion of the patent office proceedings. (Kempf Aff., Ex. 12.) Nulaid and Michael Foods subsequently negotiated a settlement agreement.

By November 1995, Michael Foods asserts that it was clear that at least some of the claims that were being adjudicated would differ from the claims that ultimately would be issued at the conclusion of the reexamination proceedings and that Sunny Fresh and Michael Foods therefore agreed to a stay in Sunny Fresh I. Sunny Fresh claims that the parties settled the case and that it filed this current action on September 12, 2000, to preserve its rights under the settlement agreement. (Sunny Fresh's Opening Markman Br. at 18.) The parties now come before the court for a Markman determination. Michael Food also brings a motion to strike expert declarations. Based on a review of the file, record and proceedings herein, and for the reasons stated, the court denies the motion to strike expert declarations[1] and construes the disputed terms as

[1] In their Markman motion, Sunny Fresh relies on three experts, Drs. Labuza, Lechowich, and Woodward. Michael Food moves to strike their declarations, asserting that the timing of the declarations was improper, that declarations are incompetent under the standard of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), that Vitronics precludes the court from considering the declarations, and that Dr. Labuza's declaration must be struck for an intractable conflict of interest. Based on a review of the file, record and proceedings herein, and after careful consideration of the parties' respective arguments, the court is unpersuaded by Michael Food's contentions. The court therefore denies Michael Food's motion to strike.

discussed below.

## I. The Law of Claim Construction

Claim construction involves ascertaining the true meaning and scope of each claim as a matter of law. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 386 (1996). "Claims are normally construed as they would be by those of ordinary skill in the art." Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 1571 (Fed. Cir. 1983); Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998)("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed.").

In determining the meaning of the terms of a claim, the court considers "intrinsic" evidence, which consists of the language of the claims, the specification of the patent and the prosecution history. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). If the meaning of the claim terms is unambiguous and can be determined from the intrinsic evidence, the court need not rely on extrinsic evidence in rendering its claim construction. See id. at 1583.

### A. Intrinsic Evidence

In its analysis of intrinsic evidence, the court first must examine the language of the claims, then evaluate the specification

of the patent and finally consider the prosecution history. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582-89 (Fed. Cir. 1996); Markman, 52 F.3d at 979-81.

### 1. The Claim

Because a patent claim defines the scope of the right to exclude, claim construction "'begins and ends in all cases with the actual words of the claim.'" SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1344 (Fed. Cir. 2001)(quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998)). Courts should give the words of a claim their ordinary and accustomed meaning. Vitronics, 90 F.3d at 1582; Transmatic, Inc. v. Gulton Indus., Inc., 53 F.3d 1270 (Fed. Cir. 1995); Gentex Corp. v. Donnelly Corp., 69 F.3d 527, 530 (Fed. Cir. 1995); ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1579 (Fed. Cir. 1988). However, "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." Vitronics, 90 F.3d at 1582.

### 2. Specification

"Claims must be read in view of the specification, of which they are a part." Markman, 52 F.3d at 979. The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claim." Id. at 979; Autogiro Co. v. United

States, 384 F.2d 391, 397-398 (Ct. Cl. 1967)("the specification aids in ascertaining the scope and meaning of the language employed in the claims inasmuch as words must be used in the same way in both the claims and the specification .... The use of the specification as a concordance for the claim is accepted by almost every court, and is a basic concept of patent law."). "However, claims are not to be interpreted by adding limitations appearing only in the specification." Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994).

**3. The Prosecution History**

The prosecution history also provide relevant information about the scope and meaning of the claim. Id.; Markman, 52 F.3d at 980. "Arguments and amendments made during the prosecution of the patent application and other aspects of the prosecution history ... must be examined to determine the meaning of the terms in the claims." Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995). One way the prosecution history can aid in the interpretation of a claim is by excluding an interpretation that was disclaimed during the prosecution. Id.

**B. Extrinsic Evidence**

"Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. In its discretion, a court may receive extrinsic evidence

in order to aid the court's understanding of the patent. Id. However, when an analysis of intrinsic evidence alone will resolve any genuine ambiguity in disputed claim terms, it is improper for the court to rely on extrinsic evidence. Vitronics, 90 F.3d at 1582; Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323 (Fed. Cir. 2001); Bell & Howell Document Mgmt. Prod. Co. v. Altek Sys., 132 F.3d 701 (Fed. Cir. 1997). Moreover, extrinsic evidence cannot be used for the purpose of varying or contradicting the terms of the claims. Markman, 52 F.3d at 981.

**C. Time Frame for Construction**

The time frame for construing claims should be the filing date of the application of the patents or the date of their amendment. See Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 760 (Fed. Cir. 1984)("The terms of the claims are best construed in light of the specification and the circumstances which surrounded the patent at its inception."); W.L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1556 (Fed. Cir. 1983)(stating that the patent-in-suit "speaks as of the application filing date, not as of the time of trial"); Quantum Corp. v. Rodime PLC, 851 F. Supp. 1382, 1385 (D. Minn. 1994)("the meaning which the inventor gives to his words can not be made to depend upon subsequent events, but should appear when the application is filed."; Waterloo Furniture Components, Ltd. v.

Haworth, Inc., 798 F. Supp. 489, 494 n. 4 (N.D. Ill. 1992)("The critical time period of claim interpretation is the filing date of their amendment, not the trial date.")

**II. The Disputed Claim Terms and Their Interpretation**

The parties have identified the disputed claim terms,(Kempf Aff., Ex. 23-24), and their respective interpretations of the terms (Kempf Aff., Ex. 25-26).[2] While this proceeding includes

---

[2] Sunny Fresh asserts that the following terms must be interpreted: (1) liquid whole egg, (2) liquid whole egg product, (3) liquid whole egg product according to ['225] claim 21, (4) consisting essentially of liquid whole egg product, (5) said liquid whole egg product is liquid whole egg, (6) non-sterile pasteurized liquid whole egg, (7) shelf life, (8) shelf life of from about 16 to 36 weeks under refrigerated conditions, (9) shelf life of about eight weeks to about 36 weeks, (10) shelf life of about four weeks to about 36 weeks, (11) shelf life of about 16 weeks, (12) shelf life of about 16 weeks to 36 weeks under refrigerated conditions, (13) characterized by a refrigerated shelf life of about four weeks to 36 weeks, (14) extended refrigerated shelf life, (15) preselected, (16) preselected shelf life, (17) a preselected refrigerated shelf life of about four weeks to about 36 weeks, (18) predetermined, (19) predetermined holding temperature, (20) predetermined holding time, (21) heated to a predetermined real temperature, (22) the liquid whole egg product is heated to a predetermined real temperature by contacting said liquid whole egg product to a heated surface, (23) wherein said predetermined temperature and predetermined time are selected to impart said predetermined shelf life, (24) equivalent temperature and equivalent time, (25) the total thermal treatment received by the liquid whole egg product [or "liquid whole egg"] is defined by [or "described by"] an equivalent temperature and an equivalent time defining a point above the 5% SPL (Batch) line of Fig. 3, (26) heated for a predetermined time and to a predetermined temperature insufficient to cause more than a 5% soluble protein loss from said product, (27) wherein said holding temperature and holding time are selected to cause a soluble protein loss of not more an a 5% from the product, (28) pasteurizing apparatus, (29) heating unit, (30) sterilized, (31) pasteurizing apparatus is sterilized, (32) coagulation, (33) insufficient to cause

(continued...)

four patents, the parties agree that the court must construe the terms in each patent the same way. (Michael Foods' Initial Markman Br. at 5; Sunny Fresh's Resp. to Def.'s Initial Markman Br. at 8.) The court therefore relies primarily on the '225 patent as representative of the other patents-in-suit. (Kempt Aff., Ex. 1, '225 patent.) The court examines the disputed terms in turn.

**A. Liquid Whole Egg and Liquid Whole Egg Product**

The parties dispute the meaning of the terms "liquid whole egg" and "liquid whole egg product."[3] The key disagreement between the

---

[2](...continued) coagulation of the liquid whole egg product [or "liquid whole egg"], (34) packaged or packaging, (35) aseptically packaged, aseptically packaging and aseptic packaging, (36) packaging the liquid whole egg product, (37) a packaged liquid whole egg product [or "liquid whole egg"], (38) subjected to turbulence for a major portion of the time said liquid whole egg product is heated, (39) a method of ultrapasteurizing, (40) a method of ultrapasteurizing liquid whole egg [or "liquid whole egg product"], (41) wherein every particle of liquid whole egg product [or "liquid whole egg"] is in contact with said heated surface for a total time less than the average residence time of each particle in the heating unit, (42) while periodically subjected said continuous stream of liquid whole egg product [or "liquid whole egg"] to turbulence, (43) liquid whole egg product is a liquid whole egg blend which is about 24-38% egg solids and about 12% or less of added non-egg ingredients, (44) wherein the liquid whole egg product contains not more than 12% of added non-egg ingredients. (Kempf Aff., Ex. 23.) Michael Foods provided eight terms to be construed by the Court: (1) aseptically packaged, (2) sterilize, (3) shelf life, (4) turbulence, (5) liquid whole egg, (6) liquid whole egg product (7) liquid whole egg blend and (8) ultrapasteurize. (Kempf Aff., Ex. 24.) In its Markman presentation, Michael Foods offers the following additional terms: (1) consisting essentially of, (2) about, (3) equivalent point, (4) predetermine time/temperature and (5) packaging.

[3] Michael Foods defines "liquid whole egg" as "Liquid whole (continued...)

parties is whether "liquid whole egg product" and "liquid whole egg" may contain preservatives. Based on a review of the intrinsic evidence, the court concludes that both may contain preservatives.

Many claims in the '225 patent refer to "liquid whole egg products" and "liquid whole eggs." The claim language, however, does not define either term. The court therefore turns to the specification for clarification. See Vitronics, 90 F.3d at 1582.

The specification defines "liquid whole egg product" and "liquid whole egg" by stating that the terms in the patent have

---

[3](...continued)
egg includes Liquid Whole Egg or Liquid Whole Egg blends with less than 2% added non-egg ingredients. Such non-egg ingredients may include preservatives." (Kempf Aff., Ex. 27.) Sunny Fresh defines "liquid whole egg" as "only liquid egg yolk and the egg whites in the natural proportions occurring in unbroken eggs." (Kempf Aff., Ex. 26.) Michael Foods defines "liquid whole egg product" as follows:

> Whole egg, fortified whole egg (whole egg with added yolk), salt whole egg (e.g. salt 10%), sugar whole egg (e.g. sugar 10%), blends of whole egg with syrup which syrups, dextrose and dextrims and/or other gums and thickening agents, blends of whole egg with less than 1% sugar and/or salf, scrambled egg mixes for example, a mix of about 51% egg solids, 30% skim mil solids, 15% vegetable oil and 1.5% salt, reduced cholesterol egg product, and blend thereof, custard blends, and the like, liquid whole egg and blends thereof (less than 2% added ingredients), liquid whole egg blends which are 24-38% egg solids and 12% or less of added non-egg ingredients." (Kempf Aff., Ex. 27.)

According to Sunny Fresh,"liquid whole egg product" means a product primarily of liquid whole egg which also may contain other ingredients to the extent specified and permitted by USDA regulations, but not shelf life extending additives. (Kempf Aff., Ex. 26.)

their "standard meaning in accordance with industry and regulatory usage." (Kempf Aff., Ex. 1, Col. 8, ll. 57-60.) Because the patent incorporates by reference regulatory usage, the court examines the regulations promulgated by the applicable regulatory agency, the USDA, at the relevant time. 7 C.F.R. § 59.5 (1985) defines liquid egg products as "... any ... liquid eggs, with or without added ingredients..." 7 C.F.R. Part 59.411(d) (1985) states that "liquid whole eggs" can be blended to have different proportions than those directly from the shell.[4]

These regulations do not exclude preservatives from their definition of "liquid whole egg product" or "liquid whole egg."

The specification also gives examples of "liquid whole egg product." It provides:

> Examples of whole egg products which can be pasteurized in liquid form by the method of the present invention include whole egg, fortified whole egg (whole egg with added yolk), salt whole egg (e.g. salt 10%), sugar whole egg (e.g. sugar 10%), blends of whole egg with syrup solids, syrups, dextrose and dextrins and/or gums and thickening agents, blends of whole eggs with less than 1% sugar and/or salt, scrambled egg mixes (for example, a mix of about 51% egg solids, 30% skim milk solids, 15% vegetable oil and 1.5% salt), reduced cholesterol egg products and blends thereof,

---

[4]It provides:

> Liquid or frozen egg products identified as whole eggs and prepared other than in natural proportions, as so broken from the shell, shall have a total egg solids content of 24.70 per cent or greater. (Id.)

> custard blends, and the like. Products which are extremely sensitive to thermal processing and which are particularly suitable for ultrapasteurization by the present invention include, for example, liquid whole eggs and blends thereof (less than 2% nonegg ingredients), fortified whole egg and blends thereof (24-38% egg solids, 2-12% added nonegg ingredients), liquid salt whole egg, liquid sugar whole egg, and other liquid whole egg blend which are 24-38% egg solids and 12% or less of added nonegg ingredients.

(Kempf Aff., Ex. 1, Col. 8, ll. 39-58.) Within those examples, the specification explains liquid whole eggs and blends thereof as containing less than 2% non-egg ingredients. (Id. at ll. 53-54.) None of these examples exclude preservatives from the definition of "liquid whole egg product" or "liquid whole egg." Thus, because the court cannot import a limitation into the specification that does not exist in the claim, the specification illustrates that "liquid whole egg" and "liquid whole egg product" may contain preservatives.

The prosecution history also supports that conclusion. During the course of the prosecution, Michael Foods argued that Dunn could be distinguished from its inventions because some of the Dunn examples used preservatives. (Stewart Decl. Ex. 12 at 159.) The Board of Appeals rejected that position because it found that Michael Food's claim did not exclude preservatives.[5] The Board's

---

[5]The Board held:

> However, claim 20 does not exclude a liquid whole egg product which may contain *preservatives* or have some egg yolk

(continued...)

holding emphasized that "liquid whole egg product" and "liquid whole egg" may include preservatives and that such an interpretation is consistent with agency regulations. (Kempf Aff., Ex. 20 at 13.)

Sunny Fresh argues that because the Board rejected Claim 20 for including preservatives, the definitions of "liquid whole egg product" and "liquid egg product" necessarily must exclude preservatives or else they are invalid based upon the Board's analysis. (Sunny Fresh's Resp. to Def.'s Initial Markman Br. at 14.) This argument fails however because the Board never found that only narrowed claims that excluded preservatives would be allowable over Dunn. In fact, the Board stated that claims with a shelf life of 8 weeks or more were patentable over Dunn. (Kempf Aff. Ex. 20 at 19-20.) If the Board believed that the exclusion of preservatives was the only possible basis for patentablilty, then the Board could not have reversed the rejection of, for example, claim 22, as claim 22 primarily differed from claim 20 by including a shelf life from about 8 weeks to about 36 weeks.

Because intrinsic evidence unambiguously defines "liquid whole egg" and "liquid whole egg product," it is improper for the court to rely on extrinsic evidence in interpreting those disputed terms.

---

[5](...continued)

> removed.... Dunn's liquid whole egg complies with the definition of liquid whole egg set forth in the appellants' specification and the egg solid requirements found in 7 C.F.R. § 59.411(d).

(Kempf Aff., Ex. 20 at 13 (emphasis added).)

See Vitronics, 90 F.3d at 1582; Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323 (Fed. Cir. 2001); Bell & Howell Document Mgmt. Prod. Co. v. Altek Sys., 132 F.3d 701 (Fed. Cir. 1997). The court nevertheless notes that the extrinsic evidence supports the court's interpretation.

Sunny Foods' own 30(b)(6) witness agreed that "liquid whole egg product" may contain preservatives. In his deposition, Dr. Efstathiou reviewed the definition of egg product provided in the Section 59.5 of Code of Federal Regulations and testified that egg product could include preservatives:

> Q: Do you understand that to be the definition of egg products given by the Code of Federal Regulations at about that time?
>
> A: Yes
>
> Q: Does that definition exclude preservatives, in your understanding?
>
> A: It doesn't say so.
>
> Q: And do you have any different understanding from your personal basis on whether it excludes it?
>
> A: Preservatives, my understanding is, was, that they need to be allowed for use for specific products.
>
> Q: So the preservatives had to be approved, but the final product using them would still be a liquid egg product?
>
> A: Yes.

(Second Kempf Aff., Ex. 43, at 24, l. 25; Id. at 25 ll. 1-14.)

Moreover, while the testimony of Dr. Woodward, another 30(b)(6) witness, was inconsistent, he admitted that preservatives could be included in the definition of "liquid whole egg product" in some circumstances. (Kempf Aff., Ex. 15 at 45, ll. 19-23.) Thus, even though the court does not rely on those two opinions, the opinions do suggest that "liquid whole egg product" may contain preservatives.

Accordingly, the court construes the disputed terms as follows:

> Liquid Whole Egg: "Liquid whole egg" refers to liquid whole egg or liquid whole egg blends containing less than 2% added non-egg ingredients. Such non-egg ingredients may include preservatives.
>
> Liquid Whole Egg Product: "Liquid whole egg product" refers to products which include liquid whole egg and may have more than 2% added non-egg ingredients. Such non-egg ingredients may include preservatives.[6][7]

---

[6]The court also construes the term "liquid whole egg blend" to include blends of whole egg with less than 1% sugar and/or salt, liquid whole egg blends which 24-38% egg solids and 12% or less of added non-egg ingredients. (See Kempf Aff., Ex. 1, Col. 8, ll. 41-60.)

Two additional terms require interpretation: (1) "liquid whole egg product is liquid whole egg blend which is about 24.38% egg solids and about 12% or less of added non-egg ingredients" and (2) "wherein the liquid whole egg product contains not more than 12% of added non-egg ingredients." In particular, the parties dispute the meaning of non-egg ingredients. Based upon a review of the file, record, proceedings and relying upon the court's construction of the terms "liquid whole egg" and "liquid egg product," supra, the court construes the term non-egg ingredients to mean any ingredients not naturally found in the egg, including shelf life extending additives.

[7] The court's definition of "liquid whole egg product" and (continued...)